Atrix et al. versus Atrix and Sanofi Synth Labo 06-12-58 Ms. Brinkman, we're ready when you are. May it please the Court, Beth Brinkman for Appellants, and at Council table with me Donald Ware and Richard Pettis, Co-Counsel. This case turns on a fundamental flaw in the claim construction that substantially prejudiced the determination and anticipation in this case. Correction of that flaw means that Appellants are entitled to judgment as a matter of law and validity. That is because, under the correct claim construction, a reasonable jury could not fail to find on the evidence that the 721 claims were anticipated by the Bridge and Franz Prior Arts. Both those patents are copolymers of lactic and glycolic acid with alcohol mers. The presence of that alcohol mer under the correct claim construction does not remove the copolymer from the scope of the 721 claims. Could you back up and help me for a moment? My impression from reading these briefs, which I found somewhat difficult to follow, is that in the Bridge patent, we actually have alcohol molecule as part of the polymer itself. It's part of the repeating molecule within the polymer. But that's not the case in the Franz one. The alcohol molecule is tacked on to the polymer. Am I correct about that? No, Your Honor. I would not agree with the characterization of the Franz patent. Is my characterization of Bridge accurate? Yes, the Bridge is a ring-opening polymerization, and it comes from the monomers of the lactide, glycolic, and the alcohol. In that case, it's glucose. Which is a polyole. That's correct, Your Honor. And that's what results in the branch shape. In fact, in the accused Eligard, there is a hexanediol, which is very similar. The only difference is that there's fewer hydroxyl end groups, and so that's linear instead of branch. But as soon as it's polyole, by definition, it will be branched from the ring-opening polymerization method. Well, let's look at the claim, and construe the claim, because that determines the relevance of Franz and Brick. Now, the claim says, comprising a copolymer of lactic acid and glycolic acid. The word comprising is before copolymer. The claim doesn't say a copolymer comprising lactic and glycolic, in which case other monomers might have been within the scope of the claim. But it says comprising a copolymer, which is limited to lactic and glycolic. Your Honor, that's where we would fundamentally disagree with you, and I have several points to make to that. But if that's correct, then Brick, as a polyole, isn't within the scope of the claim. And Franz, which has either an ester, cholesterol ester, or an amide, isn't either. Would you concede that? If that were the claim in construction, but Your Honor, then there would be no infringement either. Eligard would not be covered, because Eligard also has… Well, of course infringement isn't before us, is it? But, well, Your Honor, the decision and the record not to dispute infringement is only under the district court's claim construction that was given here. In other words, you're saying if we disagree with your claim construction, we should remand? At a minimum, Your Honor. We believe that it's very clear on this record, particularly the bridge patent I could walk you through. That is the strongest route to a judgment of matter of law on both claims. But I would like to go through the claims construction very directly, if I could. That location of the comprising is precisely the situation that was before the court in the Gillette case. And the question about the fact that comprising isn't also repeated with the of later was what the dissent would have suggested needed to be done. And that was rejected in the Gillette case. The use of the term of is also an open-ended signal, as made clear in Gillette. So there's a multi-step claim construction. You're saying the word of in patent practice is equivalent to comprising? No. I'm saying that the intrinsic evidence is very strong here about an open-ended interpretation of this claim. And, Your Honor, that is precisely what the district court in our litigation addressing the same patent, the 721 patent, did conclude that there was an open-ended claim construction here and expressly found, and that judgment's in the record of this case also, that the existence of other elements does not remove it from the scope. Well, other minor elements. That was the claim construction here. No, Your Honor. In that case, the claim was any other element was irrelevant. That was the legal analysis. There happened to be a tin catalyst and perhaps other impurities. But that was the claim construction. So first we have the intrinsic evidence of the word of use of consisting, which under this court's precedent is so clearly a signal of the claim that follows to be open-ended. Second up, there's use of the word of, as Judge O'Leary indicated. Comprising. Comprising, copolymer of. You said consistent. Excuse me. That is what we would suggest is a narrow-ended construction. So first you have comprising, copolymer of, the of being also an open-ended indication. There's no restriction there, no use of the word consisting. And then following that, you also have even the word copolymer. It's not restricted to bipolymer. Copolymer is two or more. If there was a restriction to just lactic acid and glycolic acid, one would have used the bi. Then we go to the description of the lactic acid and the glycolic acid. And very respectfully, Your Honor, I would suggest it's more complex than simply saying it comprises the copolymer of lactic and glycolic acid. Both of those compounds are given amounts, ranges in which they have to occur. And it makes clear... But even if you want to adopt their claim construction, which is not, it seems to me, the same claim construction that the district court adopted, and that the polymer has to be exclusively composed of these two acids, and that a repeating alcohol molecule wouldn't count, that seems to be a way, in my understanding of the chemistry here, to distinguish Britsch. But it is not a way to distinguish France, because if I understand correctly, in France, the polymer itself doesn't have an alcohol molecule as part of the polymer. It's tacked onto the polymer. Am I mistaken about that? It's an NCAP, Your Honor, and through that process we assume that it is part of the copolymer. And again, I have to come back to the fact that Eligard also has an alcohol mer as a component of the copolymer. So to the extent that... I would have thought you would have said that tacking it on doesn't make it part of the polymer. Well, I think that the evidence in this case, the experts did not disagree with that. I think that part of the claim construction that's important to understand is, in addition to all the open-ended signals we've talked about, there's also an amount of lactic acid. It has to be 50 to 100 percent. The claim does not say that the balance has to be glycolic acid. In other words, in the specification to give example, it does not say the balance has to be of that. And because it's elsewhere in the specification where they're talking about an example, they would know how to do that if that's what they meant. They did not mean that. Moreover, going to the specification, at page A134, the specification makes quite clear that the copolymer can be made by any method. How about column and line? It is on page 134, Your Honor. It's in column 2. Are we talking about the 721 patent? Yes, we are, Your Honor. Could you give us column and line then? Yes, Your Honor. It's in the appendix A34. I'm sorry, it's column 2. And it says, first of all, line 24. 23, 24. Line 24. Said high molecular polymer may be a copolymer produced by using two or more different monomers. Are there any others here other than lactic and glycolic in the whole patent? The alcohol myrrh, Your Honor, which is used as an initiator in the ring-opening polymerization method. And this court in its prior ruling on this patent… But they don't become part of the claimed polymer. The other part in column 2 also indicates that it can be made by any method, Your Honor. And I'm having difficulty finding the line here. I'm not sure that's an issue here because this is a product claim. Except that, Your Honor, I would say this. If you take ring-opening polymerization as one of the methods, it's covered by one of the any methods, and through that process you understand that it can be created by two or more monomers using an alcohol monomer as initiator, which is allowed under claim. But does the alcohol monomer end up as part of the claimed product? Yes, it is part of the copolymer of lactic and glycolic acid. As Your Honor pointed out, if it's a diol, it's a linear copolymer that results, and if it's a polyol, it's a multi-branch. All of those fall within, however, the scope of the 721 claim. I'd also point out that in the OWL litigation, again, the court interpreted this claim and correctly realized that it is an open-ended claim. The evidence of other elements is irrelevant. Under that correct interpretation, both the Britsch and the Franz prior arts anticipate here. The most direct path to that is through the Britsch patent, we believe. Although there was only one element disputed on the Franz patent on claim 1, in the Britsch, there were no elements disputed on claim 2. So under Britsch, once the claim construction is corrected, there is no further dispute that it meets the copolymer of lactic and glycolic acid of certain amounts because the alcohol doesn't remove it from that. The only other element that was challenged then on the Britsch patent on both claims, there were no challenges, disputes on element 2, is the monobasic acid limitation. And we believe the record is very clear here that there would be judgment of a matter of law on that. The evidence is that the acid number is arithmetically converted into the monobasic acid content and the TAPS expert at pages 8, 9690 to 9697 agreed that that is an arithmetic conversion. It's undisputed evidence from our expert that both examples 6 and 9 in the Britsch patent describe acid numbers that are below the 0.01 mole per 100 grams when converted. TAPS' only challenge on this goes to the reliability of an acid number conversion. First of all, that's not relevant because the question is about description in anticipation and that, as the description is set forth, they did not challenge enablement. And that's what they would need to do if they wanted to raise that question. And third here, the ASFTM standards make clear that that is the acceptable process to go through and address the questions that were raised. Well, until your rebuttal time, do you want to continue or save it? I'd like to save the remainder of my time, Your Honor. Thank you. Mr. Kavanaugh. Thank you, Your Honor. Good morning. Are you defending the district court's claim construction here? Absolutely, Your Honor. Did you suggest this claim construction to the district court? Yes, we did. How can it possibly be right? How do you get out of the specification, this notion that it includes only those things that a person skilled in the art would expect to be present in a polymer of this sort? I mean, where does that come from? Because a copolymer of lactic acid and glycolic acid is a well-established term of art. If you go back through the prior art, if you look at the technical dictionaries which the ALA court cited and which this court noted was an elaborate and precise description of the art. Where does this come from? What language in the claim, what language in the specification tells you that this is what the claim means? A copolymer of lactic acid and glycolic acid standing on its own has a well-established meaning. And that meaning includes that you can have such things as, for example, in Taphial, we had a tin catalyst. That is, one would expect there to be minor catalysts still present in a copolymer of lactic acid and glycolic acid. The same point with respect to the use of such a thing as a hexanediol, a traditional type of alcohol. I'm not understanding this. I would have thought that you might have had testimony that this language, copolymer of such and such and such and such acid, in the art, means such and such. I looked through the record here. My clerk looked through the record. I don't find that testimony. What I find is testimony about what one would expect to find, which seems to me incredibly vague and isn't addressed in the specific language of the claims. Well, Your Honor, we put on an expert who testified what a copolymer of lactic acid and glycolic acid would be. It would be... Would mean... I didn't find that. Where is it? Your Honor, he did testify. I believe, if you look at his testimony... I've looked at his testimony. Where do I find that testimony? He gave it in the context of what one would expect it to be. Because we had a claim construction from the trial court. And the trial court was based upon the technical dictionaries which used that term as a whole. And... Wasn't the claim construction from a prior case? It was from Tack v. Out. Right. And in the... Did that come up here? Yes. And the district court adopted Judge Oliver's construction. Is this language in Judge Oliver's construction? Judge Oliver didn't have... The answer is no. It's not in the earlier construction. The additional language about the additional compounds, elements, and macromolecules should be limited to those things that a person skilled in the art would expect to be present in a polymer of this sort and not in Judge Oliver's opinion. It is in Judge Zagel's opinion. And on what basis? I mean, when he was making this claim construction, what, for example, expert testimony said that that's the meaning of the claim language? We put in... I believe we put in a declaration from our expert, but what we relied upon principally were the technical dictionaries which utilized that term copolymer of lactic acid and glycolic acid. Do the technical dictionaries define that in the way the district court defined it? They don't go on to address what the additional compounds, elements, or macromolecules... Well, that's the problem. No, Your Honor, but let's look at, for example, let's look at Brick and let's look at Franz as to how one would understand what a copolymer of lactic acid and glycolic acid would be. Franz said, for example, in Brick, he describes it as a polyol ester. He specifically distinguishes it from a copolymer of lactic acid and glycolic acid. He says it's different. Why is it different? Because he's using a specific type of myrrh to produce a fundamentally different result. He gets a much slower degradation. Isn't the essence of your argument that the copolymer is big and that this was the essence of the plant construction, that the copolymer is limited to lactic and glycolic? Yes, Your Honor, and one of ordinary skill in the art looking at that would understand that it may include such things as minor, such a tin catalyst that was used in the process. But not an amide? But not something like a polyol ester, not a glucose, because that had not traditionally been used. Or a cholesterol ester? Or a cholesterol ester. What does traditionally used have to do with it? The question is what's meant by this language? And I don't see that you brought in any testimony from an expert saying how one would interpret this language. It's very fuzzy. You have people come in and say, well, I wouldn't expect to find this as part of the polymer. That's not directing itself to claim construction, is it? Well, Your Honor, at trial, obviously, we had a claim construction from the court. So it wouldn't be appropriate for our expert to get on the stand and try to reinterpret the claim. Okay, so before the claim construction, what expert testimony did you have telling us and telling the judge what is the meaning of this specific language in the claim? What we used, we used technical dictionaries. Fine, show me a technical dictionary that says this language that the judge included in the claim is part of the definition. What the technical dictionaries use, Your Honor, is they use the terminology, and they go on to describe it as a copolymer of PLGA, and then they use it interchangeably with lactide and glycolide. And when you look at particles, such as fronds, which is intrinsic evidence, I'm sorry, brick, which is intrinsic evidence here. Did you cite any source where any expert or any publication said the definition of the copolymers of these acids includes this definition of what can and can't be present? I'm not certain of that, Your Honor. I believe the technical dictionaries simply use that terminology. Which terminology? The terminology of a copolymer of lactic acid and glycolic acid. That may be, but where do they use this other key phrase that the district court included in the claim construction here, which is, as I understand, absolutely critical because it allows you to say that the alcohol molecule in the infringing product doesn't count, but the alcohol molecule in the prior art prevents them from being anticipatory. Your Honor, I would point you to the precise art that they rely on, brick. Brick says that we're making it with glucose. And you know what? We describe that as a polyol ester, and they say it's different from a copolymer of lactic acid and glycolic acid. Why is it different? It produces a different function. Franz, another piece of prior art. And this court has said, you can look back to the prior art to see how one ordinary skill in the art would interpret a technical phrase. Brick is, we would say, a prime illustration of what the definition is. Franz, equally compelling. They use cholesterol, and they say that makes us different from a, quote, copolymer of lactic acid and glycolic acid. But where do those patents use this would-expect-to-be-present language? They don't use it would-be-present. They're saying by inclusion of a cholesterol ester or by inclusion of glucose, we are producing something that is different from a copolymer of lactic acid and glycolic acid. Why? Because it's new, it's different. It's not what one ordinary skill in the art would expect. Were those amides and cholesterol esters just end groups? The cholesterol is an end group. The glucose is utilized to form the star. And it produces... Are you saying it's an integral part of the polymer? Absolutely, Your Honor. In both instances, they are integral parts of the polymer. And we know that because when you look at Griffin-Franz, they say as a result of being an integral part of this polymer, we are producing a different polymer than a copolymer of lactic acid and glycolic acid. In one case, it produces faster degradation, and in the other case, it produces slower degradation. That is prior art. And in addition, Your Honor, I would point out that there is precedent, such as the Conoco case, where it says minor elements can be included within a plain term. Ms. Brinkman cited the Gillette case. What does that... Gillette case, first of all, comprising, in our view, modifies biodegradable polymer. That's not what the defendants are arguing. The term biodegradable polymer may well be broad enough to embrace a wide range of polymers. But here, what does this technical term mean? In addition, in Gillette... Which technical term? Copolymer of lactic acid and glycolic acid. In your view, some alcohol molecules are okay, and some aren't, right? That's what Brinkman and Franz say. That's what the prior art says. The prior art recognizes this distinction. Where do they say some molecules are okay and some aren't? You have to look, Your Honor, at what Brinkman and Franz say with respect to their particular esters and their particular glucose. They're saying these are different. They produce something different than a copolymer of lactic acid and glycolic acid. They're saying it's different. And that's what the district court relies on in coming up with this language, as well as this court's prior holdings, that one could expect when you're dealing with a chemical patent that there may be trace elements, there may be minor contact, there may be minor elements. Other than trace elements, minor elements, what makes this claim limited to lactic and glycolic? The claim term itself, Your Honor, copolymer of lactic acid and glycolic acid... And how about the word comprising? I'm sorry, Your Honor? How about the relevance of the word comprising? Comprising, we would say, modifies biodegradable. And what the plaintiffs, what the defendants are seeking to do here is to chop up that term copolymer of lactic acid and glycolic acid. In Gillette, for example, you were dealing with a non-technical term. It used the phrase group of, and in the specification in Gillette, they specifically talked about generally a plurality of blades. There is no such suggestion of that here in the 721 specification. The 721 specification refers to only one example, which is then specifically claimed with limitations, percentage limitations. It's quite clear. It speaks in a completely different portion about generally biodegradable polymers. And under their construction, one of those, which is a lactic caprolactane, would somehow fall within the copolymer of lactic acid and glycolic acid, although the specification treats them quite separately. And it would because they say, well, it has some lactic acid in it, so it would fall within the copolymer definition, or the lactic acid definition. There is nothing in the specification to suggest that the inventor sought to take a technical term and broaden it to include a limitless set of elements. What's the basis for finding that this technical term is defined by what one would expect to be present? That's the problem I'm having. There was no expert witness who said that that's the right definition of the language in this claim, right? I don't believe that at claim construction we did not put forth an expert declaration. What we did was, we relied upon the prior art such as Brick and Franz to show that there are different types of polymers and that the prior art recognizes that a copolymer of lactic acid and glycolic acid has a traditional definition and that when you start introducing new concepts like adding cholesterol and adding glucose, you come up with something that's different because it produces a different function. It degrades either faster or slower. That makes it different. And the jury was given this instruction and the jury heard from experts who were able to, and both sides were entitled to make their arguments as to what would be or would not be. There was a factional dispute as to whether what Brick was describing was simply an initiator as they would have it or formulated a completely different copolymer which Brick himself recognizes. And that's why the district court correctly, that's why the jury correctly found in our view. In addition, on the .01, on the .01, it is simply implicit in their argument. Their expert admitted there's nothing about what aside the low molecular compounds in there. Their expert said he had to do a recalculation and as our expert pointed out, at the limits we're talking about, you can't, it is not reliable. It's not precise. The total acid number and the what aside the low molecular compounds are two different things. Thank you, Mr. Cavanaugh. Your time is up. Ms. Brinkman has a little time left. Thank you, Your Honor. I think that the prejudice, Judge Dyke was really getting to the prejudice from this completely unsupportable claim construction here. And I would just like to, on page 1.2, page 89694 in the appendix, this is testimony by a TAF expert. The question is, I just want to ask a question about element two there. Is it your understanding of element two of claim one that the polymer can contain a more of an alcohol initiator and still satisfy the second element of claim one of the 721 patent? Answer, certain alcohol initiators, yes. There is no distinction anywhere in how you can get from this claim distinction between the presence of one type of alcohol mer in the prior art and the alcohol mer in the accused product here. I'd also point out that I think it's significant in the jury instruction, the claim construction here, it was not just this troubling use of the word expect, what one skilled in the art would expect, but it was circular. It said, would expect in a polymer of this sort. Getting back to this testimony, the alcohol initiator, does that get into the polymer, or maybe even not get into the polymer, but on a one-time basis rather than being a continuous part of the polymer? Yes. Through the ring-opening polymerization method, for example, the initiator is part of what pierces open the cyclic dimer, for example, and then that monomer becomes an alcohol mer that is part of the resulting copolymer up, lactic and glycolic acid. There's no term of art here for copolymer of lactic and glycolic acid. It was a copolymer. No term of up, but there's a claim. Yes. And in the claim, it's a copolymer comprising 50 to 100 percent of one and 50 to 0, sort of a complementary amount of the other. But it isn't complementary, Your Honor. I'd say in column 2 of the patent, line 36, that is the paragraph talking about the preferred example. And there, they knew how to say it. They said, with the balance being glycolic acid. That language is not in the claim. There's open-ended signals, the use of the up. It also makes clear in the specification you can use two or more different monomers in any method. Anyone using ring-opening polymerization, which this court held in the earlier Owell ruling on this, is covered by this patent. If you use ring-opening polymerization with an alcohol initiator, you will have an alcohol murder result in copolymer that will be covered by this claim, and that's the bridge prior art. Thank you, Your Honor. Thank you, Ms. Brinkman. The case will be taken under trial. All rise. The Honorable Court adjourns the case today. Thank you. Thank you. Thank you. Thank you.